**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CALLIE KANDEL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EVENFLO COMPANY, INC., and GOODBABY INTERNATIONAL HOLDINGS LIMITED,<br><br>Defendants. | CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

**INTRODUCTION**

1. The Evenflo Revolve360 Slim and Gold Revolve360 Slim car seats (the "Affected Products" or "Products") are a line of dangerously defective child car seats, which Defendants have designed, manufactured, marketed, and sold as safe and suitable for child use since December 2022, but which Defendants now admit through an inadequate, ineffective, and delayed recall are unsafe due to a choking hazard.

2. The Affected Products include all Revolve360 Slim car seat models with model numbers beginning with "3681," specifically including models: 36812449, 36812449AZ, 36812450, 36812450POP, 36812450AZ, 36812451, 36812451AZ, 36812467, 36812467AZ, 36812468, 36812468AZ, 36812469, 36812469AZ, 36812470, 36812470A, 36812470TGT, 36812471, 36812501, 36812501A, and 36812504, manufactured between December 1, 2022 and December 8, 2024.

3. Defendants designed, manufactured, marketed, distributed, and sold the Affected Products with a dangerous defect: the headrest foam is improperly secured and can be easily accessed and dislodged by children, who can then place pieces of foam in their mouths, creating a serious choking and suffocation hazard (the "Choking Hazard Defect").

4. According to Defendants' own admission to the National Highway Traffic Safety Administration ("NHTSA"), "the headrest is accessible underneath the soft goods cover" and "the tape employed to protect against a child picking off pieces of foam does not extend sufficiently far to be fully effective."[1]

5. Defendants received notice of this Choking Hazard Defect on October 2, 2023, when a consumer reported a child picking at the foam of the product headrest and placing it in their mouth. Through the second quarter of 2025, Defendants received eight reports of foam access and ingestion, and twelve additional reports of children accessing the foam. Yet Defendants continued manufacturing and selling the dangerously defective Products, knowingly exposing hundreds of thousands of children to serious harm.

6. On or about September 29, 2025, nearly two years after first learning of the Choking Hazard Defect, Defendants initiated a voluntary recall (NHTSA Campaign No. 25C010) of approximately 324,997 units of the Affected Products (the "Recall").[2]

7. However, the Recall is wholly inadequate for consumers. Defendants offer purchasers only a free "repair kit" consisting of additional tape seal and installation instructions, which consumers must install themselves without professional verification or oversight. This tape-based remedy does not eliminate the Choking Hazard Defect, may degrade over time due to heat,

---

[1] https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25C010-5471.pdf (last accessed Nov. 4, 2025)

[2] *Id.*

cleaning, or wear and tear, provides no compensation for the defective products consumers purchased, and leaves hundreds of thousands of dangerously defective Products in American homes.

8. The Recall fails to provide consumers with refunds, product replacements, or any meaningful remedy that restores the benefit of their bargain. Defendants' remedy shifts responsibility to consumers to repair a defect that should never have existed, requiring at-home installation that could be improperly applied, thereby perpetuating the risk to children.

9. Plaintiff brings this action, individually and on behalf of all others similarly situated, to seek full compensation for economic losses including overpayment for defective products, diminished value, and out-of-pocket costs, and to obtain injunctive relief requiring Defendants to implement a proper remedy that fully protects consumers and eliminates the danger posed by the Affected Products.

## PARTIES

### A. Plaintiff Callie Kandel

10. At all relevant times, Plaintiff Callie Kandel has resided in Los Angeles, California and is a citizen of California.

11. Plaintiff Kandel purchased an Evenflo Revolve360 Slim car seat from Amazon on or around April 3, 2025 for approximately $269.00.

12. Prior to her purchase, Plaintiff Kandel was exposed to and relied on Defendants' advertising and marketing materials concerning the Products' safety and quality, including representations concerning Evenflo's commitment to safety innovation and thoughtful design. Plaintiff Kandel understood these representations to mean that the Product was safe for use by her child and free from defects that would pose a choking hazard.

13. Plaintiff Kandel was unaware of the Choking Hazard Defect at the time of her purchase. Worse, like many other class members, the headrest foam on her Product came loose and she contacted Defendants about the issue, only to be told her only relief was to participate in the inadequate recall. Had she known that the Product's headrest foam was improperly secured and could be accessed and ingested by children, creating a serious choking hazard, she would not have purchased the Product, or would have paid significantly less for it. As a result of Defendants' misrepresentations and material omissions, Plaintiff Kandel has suffered economic injury.

**B. Defendant Evenflo Company, Inc.**

14. Defendant Evenflo Company, Inc. is a corporation organized and existing under the laws of Delaware, having a principal place of business at 3131 Newark Drive, Suite 300, Miamisburg, Ohio 45342. Defendant Evenflo Company, Inc. is a citizen of Delaware and Ohio. Defendant can be served through CT Corporation System located at 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219.

15. Evenflo Company, Inc. is a major manufacturer and seller of infant and juvenile products, including car seats, strollers, and related safety equipment. At all relevant times, Evenflo Company, Inc. designed, manufactured, marketed, distributed, and sold the Affected Products throughout the United States, including through major retailers such as Amazon, Walmart, Target, Kohl's, and online at www.evenflo.com.

16. Evenflo Company, Inc. is responsible for the design, manufacture, marketing, distribution, and sale of the Affected Products, and for the misrepresentations and material omissions alleged herein.

**C. Defendant Goodbaby International Holdings Limited**

17. Defendant Goodbaby International Holdings Limited is a corporation incorporated under the laws of the Cayman Islands, doing business as Evenflo Company, Inc. in the United States, with a principal office at 120 Royall Street, Suite 101, Canton, Massachusetts 02021. Goodbaby International Holdings Limited is a citizen of Massachusetts for jurisdictional purposes.

18. Goodbaby International Holdings Limited is the parent company of Evenflo Company, Inc. and maintains operational control over Evenflo's business activities, including the design, manufacture, marketing, distribution, and sale of the Affected Products in the United States.

19. At all relevant times, Goodbaby International Holdings Limited, through its subsidiary Evenflo Company, Inc. and/or directly, was involved in and responsible for the design, manufacture, marketing, distribution, and sale of the Affected Products throughout the United States. Goodbaby International Holdings Limited imported the Affected Products, which were manufactured in China, for distribution and sale in the United States.

20. Goodbaby International Holdings Limited shares overall responsibility with Evenflo Company, Inc. for the safety of the Affected Products and for the wrongful conduct alleged herein, including the misrepresentations and material omissions, the delay in recalling the dangerously defective Products despite actual knowledge of the Choking Hazard Defect, and the implementation of an inadequate recall remedy.

**JURISDICTION AND VENUE**

21. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members, as approximately 324,997 units of the Affected Products were sold; (2) the aggregate

amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (3) there is minimal diversity because at least one Plaintiff is a citizen of a different state than at least one Defendant.

22. This Court has supplemental jurisdiction over Plaintiff' state law claims pursuant to 28 U.S.C. § 1367, as they arise from the same common nucleus of operative facts as the federal claims.

23. This Court has personal jurisdiction over Defendants because Defendant Evenflo Company, Inc. is incorporated under Massachusetts law and Defendant Goodbaby International Holdings Limited maintains its principal office at 120 Royall Street, Suite 101, Canton, Massachusetts 02021. Defendants thereby established sufficient minimum contacts by conducting substantial business in this District through the design, marketing, distribution, and sale of the Affected Products, and by maintaining their principal place of business in Canton, Massachusetts, where key decisions regarding design, marketing, and the Recall were made.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District, as Defendants' principal place of business is in Canton, Massachusetts, where Defendants engaged in the design, manufacture, marketing, and distribution of the Affected Products, and where decisions regarding the inadequate Recall remedy were made.

## COMMON FACTUAL ALLEGATIONS

### I. Defendants' Safety-Focused Marketing: Building Consumer Trust Through Deceptive Representations

25. Defendants Evenflo Company, Inc. and Goodbaby International Holdings Limited have systematically cultivated a brand image centered on safety, trust, and family protection to market and sell their car seats, including the Affected Products.

26. Evenflo prominently displays the motto "Family First, Always" as a central theme across its marketing materials, website, and product packaging, representing to consumers that family safety is the company's highest priority.[3]

27. Evenflo's website features extensive safety messaging, including prominent statements that "Evenflo is committed to providing child safety through research, testing, design, and community" and that the company goes "above and beyond government standards to provide car seats that are tested at 2X the Federal Crash Test Standard."[4]

28. These representations are designed to—and do—induce reasonable consumers into believing that Evenflo's products, including the Affected Products, are safer than competitors' products and meet the highest standards of safety and quality.

29. Defendants know that safety is the paramount concern for consumers purchasing child car seats, and they deliberately exploit this concern through their safety-focused marketing to gain competitive advantage and command premium prices.

30. Parents and caregivers purchasing car seats do so to comply with state laws requiring age-appropriate restraints for children and, more importantly, to ensure their children's safety while traveling in vehicles.

[3] https://www.evenflo.com/pages/about-evenflo (last accessed Nov. 4, 2025).

[4] https://www.evenflo.com/pages/safety-technology?srsltid=AfmBOopjR-t21wYybfwFqKKhJ_ruLti7hJS1XQ-KaLMZOyJ-SYMrQFMc (last accessed Nov. 4, 2025).

31. Every state, including Massachusetts, has child-passenger safety laws requiring age and size-appropriate restraints. These laws exist specifically because proper use of car seats dramatically reduces the risk of fatal injury for infants and young children in vehicle crashes.

32. According to the National Highway Traffic Safety Administration, proper use of car seats reduces the risk of fatal injury for infants (under 1 year old) by 71% and for toddlers (ages 1 to 4) by 54% in passenger cars.[5]

33. Consumers purchase car seats not merely to comply with legal requirements, but fundamentally to protect their children's lives and safety—which is precisely why child car seat laws exist.

34. Defendants' decades-long targeted marketing regarding the safety and reliability of their products is central to their business success. Parents trust the Evenflo and Goodbaby brands as reliable sources for safe infant and child products based on this consistent marketing.

35. As a result of Defendants' safety-focused marketing campaign, consumers recognize Defendants' brands as industry leaders in child safety and reasonably rely on Defendants to produce safe, reliable car seats that meet or exceed all applicable safety standards.

36. This consumer trust is essential for Defendants' success in the highly competitive baby products market, where safety is the most important factor influencing purchasing decisions.

## II. The Revolve360 Slim and Its Deceptive Marketing: Premium Price Without Premium Safety

37. Defendants designed, manufactured, marketed, and sold the Affected Products—the Revolve360 Slim and Gold Revolve360 Slim car seats—as premium safety products suitable

[5] *Occupant Protection*, NATION SAFETY COUNCIL https://injuryfacts.nsc.org/motor-vehicle/occupantprotection/
child-restraint/ (last accessed Nov. 4, 2025).

for protecting children from birth through approximately 50 pounds (rear-facing) and up to 65 pounds (forward-facing).

38. The Affected Products were marketed as convertible car seats featuring a 360-degree rotating base that allows parents to easily rotate the seat to face the car door for convenient placement and removal of the child.

39. Defendants marketed the Affected Products with premium safety features, including the “Sure360 Safety Installation System” with “LockStrong belt-tensioning system” and “Tether360 technology” to keep the seat “safe and secure.”[6]

40. Defendants’ marketing materials for the Affected Products emphasized convenience and ease of use, touting “one-hand, 360 degree rotation in all modes making easy in and out access” and “one-time installation safe, secure and simple.”

41. The Affected Products were sold at premium prices ranging from approximately $200 to $500, with base models priced at $399.99 and enhanced models with additional features priced up to $479.99.

42. These premium prices were justified to consumers through Defendants’ representations that the Affected Products incorporated advanced safety features, superior design, and the highest quality construction.

43. Defendants’ product pages for the Affected Products on www.evenflo.com and authorized retailer websites featured prominent safety messaging, including statements such as “Safety has never meant more” and descriptions of “advanced safety and comfort features.”

[6] https://www.evenflo.com/products/revolve360-slim-rotational-car-seat-core (last accessed Nov. 4, 2025).

44. Defendants marketed the Affected Products through major national retailers including Amazon, Walmart, Target, Kohl's, and Sears, as well as directly through www.evenflo.com, making the products widely accessible to consumers nationwide.

45. Defendants also marketed the Affected Products through video advertising, including on their official YouTube channel, highlighting the safety features and ease of use while completely omitting any mention of the Choking Hazard Defect.

46. Throughout all of this marketing—on product packaging, labeling, websites, retailer platforms, and video advertising—Defendants made a critical and material omission: they failed to disclose that the headrest foam in the Affected Products was improperly secured and could be accessed and dislodged by children, creating a serious choking and suffocation hazard.

47. Nowhere on the product pages, packaging, instruction manuals, or marketing materials did Defendants disclose the material risk that children could access, pick at, and dislodge pieces of foam from the headrest, which could then be placed in the child's mouth, creating a foreseeable choking hazard.

48. This omission is particularly egregious because Defendants designed the Affected Products knowing that children would be restrained in close proximity to the headrest for extended periods during vehicle travel, creating obvious and foreseeable opportunities for children to reach behind the cushion and access the foam.

## III. The Dangerous Choking Hazard Defect: A Design Failure That Threatens Children's Lives

49. The Affected Products contain a uniform design defect that exists in every unit manufactured: the headrest foam is improperly secured and can be accessed and dislodged by

children seated in the car seat, creating a serious choking and suffocation hazard (the "Choking Hazard Defect").

50. According to Defendants' own admission to NHTSA in the Recall Report, "the headrest is accessible underneath the soft goods cover" and "the tape employed to protect against a child picking off pieces of foam does not extend sufficiently far to be fully effective."[7]

51. The Choking Hazard Defect arises from multiple, interrelated design failures in the Affected Products, including: (a) the headrest foam is not adequately secured to the car seat frame; (b) the protective soft goods cover does not fully enclose or protect the foam from child access; (c) the tape used to secure the foam is insufficient in length and adhesion; and (d) the overall design places the foam in a location easily accessible to children.

52. When a child is properly restrained in the Affected Products, the child's head rests against or near the headrest, placing the improperly secured foam within easy reach. Children can reach behind the soft goods cover, pick at the exposed foam, dislodge pieces of foam, and place those pieces in their mouths.

53. The foam pieces, once dislodged, present a serious choking hazard if placed in a child's mouth. Young children, particularly infants and toddlers for whom the Affected Products are designed and marketed, have small airways and are at heightened risk of choking on small objects.

54. The foam is described by Defendants as non-toxic but this characterization is irrelevant and misleading because the danger is not chemical toxicity but rather the physical choking and suffocation hazard presented by foam pieces blocking a child's airway.

[7] https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25C010-5471.pdf (last accessed Nov. 4, 2025)

55. Under the Federal Hazardous Substances Act (15 U.S.C. § 1261 *et seq*.) and related regulations (16 C.F.R. § 1501.4 and 16 C.F.R. § 1500.18(a)(9)), a product presents a choking hazard if it contains or can release a "small part" that fits entirely into a standardized test cylinder designed to approximate the size of a child's throat.

56. The foam pieces that can be dislodged from the Affected Products' headrests meet the definition of small parts that present a choking hazard under these federal standards.

57. The Choking Hazard Defect makes the Affected Products "banned hazardous substances" under federal law because the products include detachable or separable components (the foam inserts) that may become dislodged during normal use and create a risk of choking for children under age 3.

58. The Choking Hazard Defect exists at the point of manufacture and sale and is present in every unit of the Affected Products. The defect is not caused by consumer misuse, improper installation, or wear and tear over time—it is an inherent design and manufacturing flaw.

59. Feasible alternative designs were available to Defendants at the time the Affected Products were designed and manufactured, including but not limited to: (a) properly securing the headrest foam with adequate adhesive or mechanical fasteners to prevent child access; (b) fully enclosing the foam within non-removable protective materials; (c) using alternative headrest materials that do not present a choking hazard; and (d) designing the headrest so that foam components are completely inaccessible to children.

60. Other car seat manufacturers produce safe car seats with properly secured headrest components, demonstrating that the risk inherent in Defendants' Affected Products is demonstrably avoidable through proper design.

61. The Choking Hazard Defect does not affect the crash safety performance of the Affected Products—the car seats function as intended to restrain children during vehicle crashes. However, the defect renders the products unsafe for their normal and intended use because children using the products as designed are exposed to a serious and unreasonable choking hazard.

**IV. Defendants' Knowledge of the Defect: Years of Reports Ignored in Pursuit of Profit**

62. Defendants received notice of the Choking Hazard Defect on October 2, 2023, when a consumer reported to Evenflo that a child had been picking at the foam of the product headrest and placing it in their mouth.[8]

63. This report put Defendants on actual notice that the Affected Products contained a design defect that allowed children to access and ingest headrest foam, creating a foreseeable choking hazard.

64. Defendants received additional reports of children accessing and ingesting the headrest foam. Through the second quarter of 2025, Defendants received eight reports of foam access and ingestion. By the time of the Recall announcement in September 2025, Defendants were aware of a total of eleven (11) reports of children who had accessed foam from the headrest and placed it in their mouth or nose, plus twelve (12) additional reports of children accessing the foam without ingestion. [9]

65. Despite having actual knowledge of the Choking Hazard Defect since at least October 2, 2023—nearly two full years before the Recall—Defendants took no action to warn consumers, redesign the Affected Products, or cease manufacturing and selling the defective car seats.

---

[8] https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25C010-5471.pdf (last accessed Nov. 4, 2025)

[9] *Id.*

66. Instead, Defendants continued to manufacture, market, distribute, and sell the Affected Products with the known Choking Hazard Defect through the Recall announcement on September 29, 2025.

67. With actual knowledge the Choking Hazard Defect, Defendants sold hundreds of thousands of additional units of the dangerously defective Affected Products to unsuspecting consumers.

68. Up until the Recall announcement on September 29, 2025, Defendants continued their Deceptive Safe Sleep Marketing campaign, promoting the Affected Products as safe and suitable for children without any warning about the Choking Hazard Defect.

69. Defendants' decision to continue manufacturing and selling the Affected Products after gaining actual knowledge of the Choking Hazard Defect demonstrates a conscious disregard for child safety in pursuit of profit.

70. Defendants knew or should have known through industry standard product testing, prior to the first consumer report, that the headrest foam in the Affected Products could become dislodged by children during normal use.

71. Defendants knew or should have known that children seated in car seats for extended periods during vehicle travel would have opportunities to reach, touch, and manipulate the headrest and surrounding areas.

72. Defendants knew or should have known that the tape used to secure the foam "does not extend sufficiently far to be fully effective" (as Defendants later admitted to NHTSA) and that this design flaw created a foreseeable risk that children would access and potentially ingest foam pieces.

73. Despite this knowledge, Defendants chose to prioritize profit over safety by continuing to sell the defective products rather than halting sales, issuing immediate warnings, or implementing a proper recall with full refunds.

## V. The Untimely and Inadequate Recall: A Remedy That Fails to Protect Children or Compensate Consumers

74. On or about September 29-30, 2025, years after first receiving notice of the Choking Hazard Defect, Defendants finally initiated a voluntary recall of the Affected Products in cooperation with NHTSA.[10]

75. The Recall was assigned NHTSA Campaign Number 25C010 and applies to approximately 324,997 units of the Affected Products manufactured between December 1, 2022 and December 8, 2024.

76. According to NHTSA's records, 100% of the recalled units are estimated to contain the Choking Hazard Defect—confirming that the defect is uniform across all Affected Products and exists at the point of manufacture.

77. The Recall covers all Revolve360 Slim car seat models with model numbers beginning with "3681," specifically including models: 36812449, 36812449AZ, 36812450, 36812450POP, 36812450AZ, 36812451, 36812451AZ, 36812467, 36812467AZ, 36812468, 36812468AZ, 36812469, 36812469AZ, 36812470, 36812470A, 36812470TGT, 36812471, 36812501, 36812501A, and 36812504.

78. The Recall explicitly does not cover other Revolve360 models, including: (a) original Revolve360 and Revolve360 Extend models (which include a high back booster mode); (b) Revolve360 Slim models with model numbers beginning with CS2601 (which have the Seat

[10] https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25C010-5471.pdf (last accessed Nov. 4, 2025)

Release Lock at the front of the base); and (c) Revolve360 Slim models beginning with 3682 (which have been updated with protective tape seal).

79. However, the "remedy" offered by Defendants through the Recall is wholly inadequate for consumers and fails to eliminate the Choking Hazard Defect or provide proper compensation.

80. Instead of offering full refunds or product replacements, Defendants offer only a free "repair kit" containing additional tape seal and installation instructions.

81. The repair kit requires consumers to install the additional tape themselves, without professional verification, oversight, or assistance, placing the burden of remedying Defendants' defective design on consumers who have already paid premium prices for products they believed to be safe.

82. The tape-based remedy does not actually eliminate the Choking Hazard Defect. The tape may degrade over time due to heat exposure (particularly relevant for car seats exposed to summer temperatures inside vehicles), repeated cleaning, or normal wear and tear.

83. Defendants' own admission to NHTSA confirms that the original tape "does not extend sufficiently far to be fully effective." The repair kit merely adds more tape—the same inadequate solution that failed in the original design.

84. The Recall instructions state that consumers should "continue to use your Revolve360 Slim safely as long as your child has not been able to reach or remove the foam in the headrest" but should "stop using the seat and contact" Evenflo if the child accesses the foam.

85. These instructions are inadequate and dangerous because they: (a) encourage continued use of products with a known safety defect; (b) place responsibility on parents to monitor whether their child has accessed the foam, even though such access may occur without the parent's

knowledge during vehicle travel; and (c) provide no guidance for what parents should do pending receipt and installation of the repair kit.

86. The Recall provides no monetary compensation to consumers who paid premium prices ($200-$500) for the Affected Products based on Defendants' representations that the products were safe and met the highest safety standards.

87. Consumers who purchased the Affected Products received products that were defective at the point of sale and never conformed to Defendants' representations of safety. Yet the Recall offers no refunds, no compensation for diminished value, and no acknowledgment of Defendants' breach of their promises to consumers.

88. The Recall places the burden and risk on consumers in multiple ways: (a) consumers must register their products to receive the repair kit; (b) consumers must properly install the repair kit themselves; (c) consumers bear the risk that the tape-based repair will fail over time; and (d) consumers must monitor their children for foam access even after installing the repair.

89. The Recall is inadequate to reach all affected consumers. Many consumers may have disposed of product packaging and registration materials, may not see the Recall announcement, or may have purchased the products as gifts or second-hand, making it impossible for them to receive notice or participate in the Recall.

90. As of the date of this Complaint, there is no evidence that Defendants have taken steps to remove recalled products from secondary markets such as online resale platforms, consignment stores, or garage sales, where unsuspecting consumers may purchase the defective Products without knowledge of the Recall.

91. The inadequacy of the Recall leaves hundreds of thousands of dangerously defective car seats in American homes, vehicles, and secondary markets, continuing to pose a serious choking and suffocation hazard to children.

## VI. Economic Harm to Plaintiff and the Class: Overpaying for Defective Products

92. Plaintiff and Class Members suffered economic injury as a direct and proximate result of Defendants' misrepresentations, material omissions, and sale of the defective Affected Products.

93. Plaintiff and Class Members paid premium prices for the Affected Products—ranging from approximately $200 to $500 per unit—based on Defendants' representations that the products were safe, met or exceeded federal safety standards, and incorporated advanced safety features.

94. Had Plaintiff and Class Members known at the time of purchase that the Affected Products contained the Choking Hazard Defect, they would not have purchased the products at all, or would have paid significantly less for them.

95. A reasonable consumer would not purchase a child car seat—a product designed and purchased specifically to protect children's safety—if the consumer knew the product contained a design defect that created a serious choking and suffocation hazard.

96. The presence of the Choking Hazard Defect was material to Plaintiff' and Class Members' purchasing decisions. Safety is the paramount concern for consumers purchasing child car seats, and a known choking hazard directly contradicts the fundamental purpose for which consumers purchase such products.

97. The Affected Products, as sold with the Choking Hazard Defect, did not have the characteristics, uses, benefits, or qualities that Defendants promised and that Plaintiff and Class Members reasonably expected.

98. The Affected Products are worth substantially less than the prices Plaintiff and Class Members paid, or are worthless, because the products contain a dangerous defect that renders them unsuitable for their intended purpose of safely transporting children.

99. Even after the Recall, the Affected Products retain diminished value because: (a) the tape-based repair does not fully eliminate the Choking Hazard Defect; (b) consumers must rely on self-installed repairs that may fail over time; (c) the products carry the stigma of a safety recall; and (d) consumers who wish to sell or donate the products must disclose the recall, further diminishing value.

100. Plaintiff and Class Members also suffered economic harm through out-of-pocket costs, including the cost of their time in dealing with the Recall process, the cost of purchasing alternative car seats if they chose to stop using the defective products, and incidental costs associated with Defendants' breach.

101. Plaintiff and Class Members are entitled to restitution, disgorgement of Defendants' ill-gotten gains, actual damages, and other relief as prayed for herein.

## CLASS ACTION ALLEGATIONS

102. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), on behalf of herself and the members of the following proposed nationwide class ("**Nationwide Class**"):

> **During the fullest period allowed by law, all persons who purchased the Affected Products (Revolve360 Slim and Gold Revolve360 Slim car seats with model numbers beginning with "3681" manufactured between December 1,**

**2022 and December 8, 2024) in the United States for personal use and not resale.**

103. Plaintiff Callie Kandel also brings this action pursuant to Fed. R. Civ. P. 23, on behalf of herself and the members of the following proposed California class ("**California Subclass**"):

**During the fullest period allowed by law, all persons who purchased the Affected Products in the State of California for personal use and not resale.**

104. Specifically excluded from the Nationwide Class and Subclasses are: (1) Defendants, any entity in which Defendants have a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; (3) Class Counsel; and (4) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out. Plaintiff reserves the right to amend the Class definitions as necessary.

105. Plaintiff seeks only damages and equitable relief on behalf of herself and the putative Classes. Plaintiff disclaims any intent or right to seek any recovery in this action for personal injuries, wrongful death, or emotional distress suffered by Plaintiff and/or putative Class Members.

106. Plaintiff reserves the right to modify the class definitions, if necessary, to include additional products made by Defendants with the same Choking Hazard Defect and/or other products manufactured by Defendants with the common defect but bearing different brand names or model numbers.

107. ***Numerosity (Rule 23(a)(1)):*** The Members of the Nationwide Class and Subclasses are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of at least hundreds of thousands of

people throughout the United States and thousands of people in the states of New York and California, as approximately 324,997 Affected Products were sold. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The Classes are readily identifiable from information and records in the possession of Defendants and their authorized distributors and retailers.

108. ***Commonality (Rule 23(a)(2)):*** Common questions of law and fact exist as to all Members of the Classes. These questions predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the Classes. Such common legal or factual questions include, *inter alia*:

a. Whether the Affected Products contain the Choking Hazard Defect;

b. Whether the Affected Products are defectively designed and/or manufactured;

c. Whether Defendants knew or should have known about the Choking Hazard Defect in the Affected Products prior to distributing and selling them to Plaintiff and Class Members;

d. Whether Defendants knew or should have known about the Choking Hazard Defect in the Affected Products after distributing and selling them to Plaintiff and Class Members;

e. Whether Defendants concealed from and/or failed to disclose to Plaintiff and Class Members that the Affected Products contained the Choking Hazard Defect;

f. Whether Defendants failed to adequately warn Plaintiff and Class Members that the Affected Products contained the Choking Hazard Defect and were not safe for children;

g. Whether Defendants engaged in unfair, unconscionable, or deceptive trade practices by selling and/or marketing the Affected Products containing the Choking Hazard Defect;

h. Whether Plaintiff and the members of the Classes have been injured by Defendants' misconduct, and the proper measure of their losses as a result of those injuries;

i. Whether Plaintiff and the members of the Classes are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount and nature of such damages; and

j. Whether Plaintiff and the members of the Classes are entitled to injunctive, declaratory, or other equitable relief including enjoining Defendants from selling and marketing the Affected Products containing the Choking Hazard Defect and/or implementing a corrective advertising campaign to alert consumers to the safety concerns and dangers of the Affected Products.

109. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of themselves and other Class Members. Similar or identical statutory violations, common law wrongs, business practices, and injuries are involved. Individual questions, if there are any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action.

110. ***Typicality (Rule 23(a)(3)):*** Plaintiff' claims are typical of the claims of the Class because Plaintiff, like all other Class Members, purchased Affected Products that were manufactured, marketed, advertised, distributed, and sold by Defendants. Plaintiff, like all Class Members, were damaged by Defendants' uniform misconduct in that, *inter alia*, they have incurred or will continue to incur damage as a result of overpaying for the Affected Products that were manufactured with the Choking Hazard Defect, which makes the Affected Products unsafe, inherently dangerous, and not fit for their intended use, and which is subject to an inadequate Recall. Furthermore, the factual basis of Defendants' misconduct is common to all Class Members

because Defendants engaged in systematic fraudulent behavior that was deliberate, includes negligent misconduct, and results in the same injury to all Class Members. Plaintiff are advancing the same claims and legal theories on behalf of themselves and all members of the Classes they seek to represent.

111. ***Adequacy of Representation (Rule 23(a)(4)):*** Plaintiff will fairly and adequately protect the interests of Class Members. Plaintiff has no interests antagonistic to those of other Class Members. Plaintiff retained attorneys experienced in the prosecution of class actions, including consumer products, infant and child products, product defects, misrepresentation, mislabeling, and false advertising, and Plaintiff intends to prosecute this action vigorously.

112. ***Predominance and Superiority (Rule 23(b)(3)):*** Plaintiff and Class Members have all suffered and will continue to suffer risk of harm and damages as a result of Defendants' unlawful and wrongful conduct. The common questions of law and fact identified herein predominate over any questions affecting individual Class Members. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high given the price point of the Affected Products and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

113. The claims presented in this case predominate over any questions of law or fact affecting individual Class Members.

114. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

115. ***Injunctive Relief (Rule 23(b)(2)):*** The elements of Rule 23(b)(2) are met. Defendants will continue to commit the unlawful practices alleged herein, and Plaintiff and Class Members will continue to be deceived by Defendants' misrepresentations and omissions and unknowingly be exposed to the risk of serious and life-threatening harm associated with the Affected Products. Defendants have acted and refused to act on grounds that apply generally to the Classes, such that final injunctive relief, public injunctive relief, and corresponding declaratory relief are appropriate respecting the Classes as a whole. Injunctive relief, and specifically public injunctive relief, is necessary in this action.

116. Plaintiff further seek injunctive and declaratory relief requiring Defendants to cease their unfair, deceptive, and unlawful conduct, including implementation of an adequate recall remedy that provides full refunds or replacement products to consumers.

117. Plaintiff also seeks a declaration that the Affected Products suffer from the Choking Hazard Defect and that all warranties cover the defect, which existed at the time of sale of the Affected Products to consumers, which was known to Defendants and unknown to consumers.

118. Plaintiff and Class Members have been harmed and will experience irreparable future harm should Defendants' conduct not be enjoined because they will continue to use the Affected Products, which still contain the Choking Hazard Defect even with the inadequate tape-based repair provided through the Recall.

119. Defendants' failure to implement an adequate recall for the Affected Products arises out of a common omission or failure to act, which has a uniform effect on Plaintiff and all Class Members. Plaintiff seeks preliminary and permanent injunctive relief and equitable relief on behalf of the entire Classes, on grounds generally applicable to the entire Classes, to require Defendants to discontinue their unlawful conduct.

120. Defendants implemented uniform procedures relating to the Recall, which resulted in uniform damage to Plaintiff and Class Members. As a result, Defendants have acted or refused to act on grounds generally applicable to each Class Member, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

121. Because Plaintiff seeks injunctive and corresponding declaratory and equitable relief for the entire Classes, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants.

## TOLLING OF THE STATUTES OF LIMITATIONS

### Discovery Rule

122. The causes of action alleged herein accrued upon discovery of Defendants' misrepresentations and material omissions related to the labeling, marketing, and advertising of the Affected Products. Because of Defendants' misrepresentations and material omissions, Plaintiff and Members of the Classes did not discover, and could not have known, that the Affected Products suffer from the Choking Hazard Defect that poses serious safety risks through reasonable and diligent investigation.

123. Plaintiff and other Class Members could not have discovered through the exercise of reasonable diligence that the Affected Products contained the Choking Hazard Defect within the time-period of any applicable statutes of limitation.

124. Plaintiff was not aware of the Choking Hazard Defect and attendant safety risks prior to the Recall announcement. Defendants concealed and misrepresented the dangerous Choking Hazard Defect in the Affected Products and the risks that were posed by the Defect.

125. Among other things, neither Plaintiff nor the other Class Members knew or could have known that the Affected Products contain the Choking Hazard Defect prior to the Recall announcement on September 29, 2025.

126. The Choking Hazard Defect was not discoverable by Plaintiff and the other Class Members through reasonable efforts. The headrest foam appeared properly secured on visual inspection, and consumers had no reason to suspect that children could access and dislodge foam pieces during normal use.

127. Reasonable and diligent investigation did not, and could not, reveal a factual basis for a cause of action based on Defendants' material omissions and concealment of the Choking Hazard Defect.

128. Plaintiff and other Class Members could not have reasonably discovered and could not have known of facts that would have caused a reasonable person to suspect that Defendants knowingly failed to disclose material information within their knowledge about the dangerous Choking Hazard Defect to consumers in the United States.

129. As such, no potentially relevant statute of limitations should be applied against Plaintiff' or Class Members' claims.

**Fraudulent Concealment**

130. Throughout the time period relevant to this action, Defendants concealed from and failed to disclose to Plaintiff and the other Class Members vital information about the Choking Hazard Defect described herein.

131. Defendants had a duty to disclose to Plaintiff and the Class Members the true quality and nature of the Affected Products, that the Affected Products have a uniform dangerous Choking Hazard Defect, and that the Affected Products pose safety concerns and are in fact dangerous.

132. This duty arose, among other things, from Defendants' safety-focused marketing including explicit representations that the Affected Products were safe and met or exceeded federal safety standards, and from Defendants' exclusive knowledge of the Choking Hazard Defect based on consumer incident reports.

133. Throughout the Class Period, at all relevant times, Defendants have known that the Affected Products, which they designed, manufactured, and sold, contained the Choking Hazard Defect resulting in serious safety risks to infants and young children.

134. Defendants' actual knowledge of the serious safety concerns surrounding the Affected Products is evidenced by, among other things, the consumer reports of foam access and ingestion, the eleven reports of children placing foam in their mouth or nose, and the twelve additional reports of foam access known to Defendants prior to the Recall announcement.

135. Despite Defendants' knowledge of the Choking Hazard Defect and serious safety issues posed by the Affected Products when used as intended, Defendants failed to disclose and instead concealed material information including the presence of the Choking Hazard Defect from

Plaintiff and other Class Members, even though, at any point in time, they could have disclosed the Defect through an earlier recall, individual correspondence, media release, or by other means.

136. Instead, Defendants continued to market the Affected Products as suitable for their intended purpose and as safe products that met or exceeded federal safety standards for nearly two years after first learning of the Choking Hazard Defect.

137. The purpose of Defendants' concealment of the dangers was to continue to profit from the sale of their Affected Products and to prevent Plaintiff and other Class Members from seeking redress.

138. Plaintiff and the other Class Members justifiably relied on Defendants to disclose the true nature of the Affected Products they purchased because the Choking Hazard Defect was not discoverable by Plaintiff and the other Class Members through reasonable efforts.

139. Defendants kept Plaintiff and the other Class Members ignorant of vital information essential to the pursuit of their claims.

140. As a result, neither Plaintiff nor the other Class Members could have discovered the Choking Hazard Defect, even upon reasonable exercise of due diligence.

141. Given Defendants' failure to disclose this non-public information, over which Defendants had exclusive control, about the nature of the Affected Products, the Choking Hazard Defect, and attendant safety risks—and because Plaintiff and the Class could not reasonably have known the true nature of the Affected Products or the Choking Hazard Defect posed—Plaintiff and the Class reasonably relied on Defendants' material omissions.

142. Any applicable statute of limitations has been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which is ongoing.

**Estoppel**

143. Defendants were under a continuous duty to disclose to Plaintiff and other Class Members the fact they knew about the dangerously defective nature of the Affected Products, namely the existence of the Choking Hazard Defect detailed above.

144. Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Affected Products from Plaintiff and Class Members.

145. At all relevant times, Defendants knowingly, affirmatively, and actively misrepresented and concealed the true character, quality, and nature of the Affected Products and sold the Affected Products into the stream of commerce with the material omissions and Choking Hazard Defect.

146. Plaintiff and the Class reasonably relied on Defendants' material omissions. Had Plaintiff and the Class known that the Affected Products had the Choking Hazard Defect which posed serious safety hazards to children, they would not have purchased the Affected Products or would have paid significantly less for them.

147. Plaintiff and the Class have been kept ignorant by Defendants of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

148. Thus, Defendants are estopped from relying on any statutes of limitations in defense of this action.

149. Additionally, Defendants are estopped from raising any defense of laches due to their own conduct as alleged herein.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (*On Behalf of Plaintiff and the Nationwide Class*)

150. Plaintiff incorporates the allegations set forth in the previous Paragraphs as though set forth fully herein.

151. Plaintiff brings this claim on behalf of themselves and the Nationwide Class against Defendants.

152. Defendants are and were at all relevant times "merchants" with respect to the Affected Products under applicable state Uniform Commercial Code provisions, and a "seller" of the Affected Products.

153. Plaintiff and all Nationwide Class members who purchased the Affected Products are "buyers" within the meaning of applicable state Uniform Commercial Code provisions.

154. The Affected Products are and were at all relevant times "goods" within the meaning of applicable state Uniform Commercial Code provisions.

155. As the developers, manufacturers, marketers, distributors, and sellers of the Affected Products, Defendants impliedly warranted that the Affected Products were merchantable and fit for their intended use—specifically, to safely restrain and protect infants and young children during vehicle travel.

156. Defendants impliedly warranted to Plaintiff and Class Members that the Affected Products were free of defects and were merchantable and fit for their ordinary purpose for which such goods are used.

157. Under applicable state law, a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. To be merchantable, goods must be fit for the ordinary purposes for which such goods are used.

158. As alleged herein, Defendants breached the implied warranty of merchantability because the Affected Products suffer from the Choking Hazard Defect. The Affected Products are, therefore, defective, unmerchantable, and unfit for their ordinary, intended purpose.

159. The Affected Products, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they were sold—safely restraining children during vehicle travel without exposing them to choking hazards.

160. Specifically, the headrest foam in the Affected Products is improperly secured and can be accessed and dislodged by children during normal use, creating a serious choking and suffocation hazard. This defect renders the Affected Products unsuitable and unsafe for their intended purpose.

161. Due to the Choking Hazard Defect, Plaintiff and members of the Class cannot use the Affected Products as intended—as safe car seats substantially free from defects. The Affected Products do not provide the safe and reliable function as intended, represented, or described, and pose a serious risk of injury and death. As a result, Plaintiff and members of the Class cannot use the Affected Products for the purposes for which they purchased them.

162. Plaintiff and Class Members are among those intended to be ultimate consumers of the Affected Products.

163. Plaintiff and each Class Member's acquisition of the Affected Products suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Defendants, on the other hand. However, privity of contract need not be established because

Plaintiff and Class Members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and distributors, and, specifically, of Defendants' implied warranties.

164. Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers. These intermediaries sell the Affected Products to consumers and are not, themselves, consumers of the Affected Products, and therefore have no rights against Defendants.

165. Defendants' warranties were designed to influence consumers who purchased and/or owned the Affected Products.

166. Plaintiff did not receive or otherwise have the opportunity to review, at or before the time of sale, any purported warranty exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable.

167. Furthermore, any attempt by Defendants to disclaim or limit the implied warranty of merchantability is unenforceable because the Affected Products pose serious safety risks to children. A product that creates a choking hazard cannot be lawfully sold under an implied warranty of merchantability regardless of any disclaimer.

168. Defendants were on notice of the breach of implied warranty of merchantability through numerous consumer complaints, through the Recall announcement, and through notice provided by Plaintiff's counsel. Moreover, on November 21, 2025, Plaintiff, through counsel, served a notice upon Defendants via certified mail notifying them of the alleged violations set forth herein and demanding that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act.

169. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and Class Members have been injured and suffered damages in an amount to be proven at trial, including but not limited to the purchase price paid for the defective Affected Products, out-of-pocket costs, and diminished value.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(*On Behalf of Plaintiff and the Nationwide Class*)**

170. Plaintiff incorporates the allegations set forth in the previous Paragraphs as though set forth fully herein.

171. Plaintiff brings this claim on behalf of themselves and the Nationwide Class against Defendants.

172. Defendants are and were at all relevant times "merchants" with respect to the Affected Products under applicable state Uniform Commercial Code provisions, and a "seller" of the Affected Products.

173. Plaintiff and all Nationwide Class members who purchased the Affected Products are "buyers" within the meaning of applicable state Uniform Commercial Code provisions.

174. The Affected Products are and were at all relevant times "goods" within the meaning of applicable state Uniform Commercial Code provisions.

175. In connection with the purchase of all Affected Products, Defendants provided Plaintiff and Class Members with written and oral express warranties that the Affected Products were safe, met or exceeded federal safety standards, and were free of defects.

176. Through their marketing, advertising, packaging, labeling, and promotional materials described herein, Defendants expressly warranted and represented that the Affected Products were safe and suitable for use by infants and young children during vehicle travel.

177. Specifically, Defendants made the following express warranties and representations to Plaintiff and Class Members:

a. "Family First, Always"—representing that family safety is the company's highest priority;

b. "Safety Innovation" and "Thoughtful Design"—representing that the products incorporate advanced safety features and careful engineering;

c. "Evenflo is committed to providing child safety through research, testing, design, and community"—representing that the products are thoroughly researched, tested, and designed for child safety;

d. Going "above and beyond government standards to provide car seats that are tested at 2X the Federal Crash Test Standard"—representing that the products exceed safety requirements;

e. "Sure360 Safety Installation System" with "LockStrong" and "Tether360 technology" to keep the seat "safe and secure"—representing that the products incorporate safety systems;

f. "360-degree rotating base for easy in and out access" with emphasis on safety and convenience—representing that the products are both safe and user-friendly;

g. "Safety has never meant more"—representing paramount commitment to safety;

h. "Peace of mind all the way around"—representing that the products provide safety assurance; and

i. Representations that the products meet all applicable federal safety standards and are suitable for their intended purpose.

178. These express warranties were affirmations of fact and promises relating to the goods that became part of the basis of the bargain between Defendants and Plaintiff and Class Members.

179. Defendants' express warranties formed the basis of the bargain that was reached when Plaintiff and Class Members purchased the Affected Products.

180. Plaintiff and Class Members read and relied upon Defendants' express warranties when deciding to purchase the Affected Products, and these warranties were part of the basis of the bargain.

181. Defendants breached their express warranties because the Affected Products are not safe or suitable for use by infants and young children as represented. The Affected Products contain the Choking Hazard Defect, which directly contradicts Defendants' express representations about safety.

182. Specifically, the headrest foam in the Affected Products is improperly secured and can be accessed and dislodged by children during normal use, creating a serious choking and suffocation hazard. This defect renders the products unsafe and unsuitable for their intended purpose, contrary to Defendants' express warranties.

183. The Affected Products do not conform to the express warranties because they fail to provide the safety and reliability that Defendants expressly promised, they contain a dangerous defect that poses serious risk to children, and they do not meet the safety standards that Defendants represented.

184. Defendants knew or should have known that their express warranties were false at the time they made them, particularly after receiving the first consumer report of the Choking Hazard Defect in October 2023, yet continued to make these representations.

185. Defendants were on notice of the breach of express warranty through numerous consumer complaints, through the Recall announcement, and through notice provided by Plaintiff's counsel. Moreover, on November 21, 2025 concurrently with the filing of this Complaint, Plaintiff, through counsel, served a notice upon Defendants via certified mail notifying them of the alleged violations set forth herein and demanding that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act.

186. As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and Class Members have been injured and suffered damages in an amount to be proven at trial, including but not limited to the purchase price paid for the defective Affected Products, out-of-pocket costs, and diminished value.

**COUNT III**
**VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT**
**Cal. Civ. Code §§ 1750, et seq.**
***(On Behalf of Plaintiff and the California Subclass)***

187. Plaintiff incorporates the allegations set forth in the previous Paragraphs as though set forth fully herein.

188. This Count is brought on behalf of Plaintiff and the California Subclass ("Subclass" for purposes of this Count) for violation of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. ("CLRA").

189. Plaintiff and California Subclass Members are "consumers" who purchased the Affected Products for personal, family, or household purposes. Plaintiff and the California Subclass are "consumers" as that term is defined by the CLRA in Cal. Civ. Code § 1761(d).

190. The Affected Products that Plaintiff and California Subclass Members purchased from Defendants were "goods" within the meaning of Cal. Civ. Code § 1761(a).

191. Defendants' actions, representations, and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted in, the sale of goods to consumers.

192. Defendants' marketing and labeling of the Affected Products is false and misleading, and its omission of the Choking Hazard Defect is false and misleading to reasonable consumers, including Plaintiff. As discussed above, Defendants' representations concerning the safety and qualities of the Affected Products are false and misleading due to the Choking Hazard Defect. Further, because of the defect, the Affected Products cannot be used for their principal or intended purpose, and are effectively worthless. The Affected Products are unreasonably dangerous products that are unfit for use or sale.

193. California's Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(5), prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have." By engaging in the conduct set forth herein, Defendants violated and continue to violate Section 1770(a)(5) of the CLRA, because Defendants' conduct constitutes unfair methods of competition and unfair acts or practices, in that Defendants misrepresented the particular characteristics, uses, benefits, and quantities of the Affected Products.

194. Cal. Civ. Code § 1770(a)(7) prohibits representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another. By engaging in the conduct set forth herein, Defendants violated and continue to violate Section 1770(a)(7) of the CLRA, because Defendants' conduct constitutes unfair methods of

competition and unfair acts or practices, in that Defendants misrepresented the particular standard, quality, or grade of the goods.

195. Plaintiff and the California Subclass acted reasonably when they purchased the Affected Products based on their belief that Defendants' representations were accurate, true, and lawful.

196. Plaintiff and the California Subclass suffered injuries caused by Defendants because (a) they would not have purchased the Affected Products absent Defendants' misrepresentations and omissions; (b) they would not have purchased the Affected Products on the same terms absent Defendants' representations and omissions; (c) they paid a price premium for the Affected Products due to Defendants' misrepresentations and omissions; and (d) the Affected Products did not have the characteristics, benefits, or quantities as promised.

197. Plaintiff and California Subclass Members have suffered an injury in fact resulting in the loss of money and/or property as a proximate result of the violations of law and wrongful conduct of Defendants alleged herein, and they lack an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to Plaintiff and California Subclass Members are inadequate because they are not equally prompt, certain, and in other ways efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fail to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money Defendants wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles Plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of

interest would recognize. Legal claims for damages are not as certain as restitution claims because claims under the UCL entail fewer elements. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

198. Equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from the purchase of the Affected Products is determined to be an amount less than the premium price of the products. Without compensation for the full premium price of the products, Plaintiff would be left without the parity in purchasing power to which they are entitled.

199. On November 21, 2025, Plaintiff, through counsel, served a notice upon Defendants pursuant to California Civil Code § 1782(a) via certified mail notifying them of the alleged violations of the CLRA set forth herein and demanding that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act.

200. Plaintiff seeks only injunctive and equitable relief under the CLRA in this initial Complaint. If Defendants fail to provide appropriate relief within thirty (30) days of the date of the notice, Plaintiff will amend this Complaint to seek monetary damages under the CLRA pursuant to California Civil Code § 1782(d).

**COUNT IV**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,**
**Cal. Bus. & Prof. Code §§ 17200, et seq.**
***(On Behalf of Plaintiff and the California Subclass)***

201. Plaintiff incorporates the allegations set forth in the previous Paragraphs as though set forth fully herein.

202. This Count is brought on behalf of Plaintiff and the California Subclass ("Subclass" for purposes of this Count).

203. Defendants are subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful [or] unfair ... business practices and unfair, deceptive, untrue or misleading advertising ...."

204. Defendants' marketing and labeling of the Affected Products is false and misleading, and its omission of the Choking Hazard Defect is false and misleading to reasonable consumers, including Plaintiff. As discussed above, Defendants' representations concerning the safety and qualities of the Affected Products are false and misleading due to the Choking Hazard Defect. Further, because of the defect, the Affected Products cannot be used for their principal or intended purpose, and are effectively worthless. The Affected Products are unreasonably dangerous products that are unfit for use or sale.

205. Defendants' business practices, described herein, violated the "unlawful" prong of the UCL by violating the CLRA, the FAL, and other applicable law as described herein.

206. Defendants' business practices, described herein, violated the "unfair" prong of the UCL in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits. Defendants' advertising is of no benefit to consumers. Selling the Affected Products in a manner that makes them inherently dangerous is of no benefit to consumers. Defendants' sale of the Affected Products with the Choking Hazard Defect causes a threat to public health, safety, and morality. Consumers are unwittingly purchasing and using the Affected Products without knowing that they are unsafe and inherently dangerous, which in no way provides any benefit to consumers.

207. Plaintiff and the California Subclass acted reasonably when they purchased the Affected Products based on their belief that Defendants' representations were not misleading, true, and lawful.

208. Plaintiff and the California Subclass lack an adequate remedy at law for the same reasons alleged above.

209. Plaintiff and the California Subclass suffered injuries caused by Defendants because (a) they would not have purchased the Affected Products absent Defendants' misrepresentations and omissions; (b) they would not have purchased the Affected Products on the same terms absent Defendants' representations and omissions; (c) they paid a price premium for the Affected Products due to Defendants' misrepresentations and omissions; and (d) the Affected Products did not have the characteristics, benefits, or quantities as promised.

**COUNT V**
**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW,**
**Cal. Bus. & Prof. Code §§ 17500, et seq.**
***(On Behalf of Plaintiff and the California Subclass)***

210. Plaintiff incorporates the allegations set forth in the previous Paragraphs as though set forth fully herein.

211. This Count is brought on behalf of Plaintiff and the California Subclass ("Subclass" for purposes of this Count).

212. California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading

and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

213. Defendants engaged in a scheme of offering mislabeled Affected Products for sale to Plaintiff and California Subclass Members by way of product packaging, labeling, and other promotional materials. These materials misrepresented and/or omitted the true content and nature of the Affected Products. Defendants' advertisements, labeling, and inducements come within the definition of advertising as contained in Bus. & Prof. Code § 17500, et seq. in that the product packaging, labeling, and promotional materials were intended as inducements to purchase the Affected Products, and are statements disseminated by Defendants to Plaintiff and Subclass Members. Defendants knew, or reasonably should have known, that these statements were unauthorized, inaccurate, and misleading.

214. Defendants' marketing and labeling of the Affected Products is false and misleading, and its omission of the Choking Hazard Defect is false and misleading to reasonable consumers, including Plaintiff. As discussed above, Defendants' representations concerning the safety and qualities of the Affected Products are false and misleading due to the Choking Hazard Defect. Further, because of the defect, the Affected Products cannot be used for their principal or intended purpose, and are effectively worthless. The Affected Products are unreasonably dangerous products that are unfit for use or sale.

215. Defendants knew or should have known, through the exercise of reasonable care, that their representations and omissions were false and misleading and that the Choking Hazard Defect caused the Affected Products to be unreasonably dangerous products that are unfit for use or sale.

216. Plaintiff lacks an adequate remedy at law for the same reasons alleged above.

217. Plaintiff and the Subclass suffered injuries caused by Defendants because (a) they would not have purchased the Affected Products absent Defendants' misrepresentations and omissions; (b) they would not have purchased the Affected Products on the same terms absent Defendants' representations and omissions; (c) they paid a price premium for the Affected Products due to Defendants' misrepresentations and omissions; and (d) the Affected Products did not have the characteristics, benefits, or quantities as promised.

**COUNT VI**
**Breach of Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq*.**
**(*On Behalf of Plaintiff and the California Subclass*)**

218. Plaintiff incorporates the allegations set forth in the previous Paragraphs as though set forth fully herein.

219. This Count is brought on behalf of Plaintiff and the California Subclass ("Subclass" for purposes of this Count).

220. Plaintiff's Affected Product is a "consumer good" within the meaning of the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1795.1.

221. Defendants were at all relevant times the manufacturers, distributors, warrantors, and/or sellers of the Affected Products. Defendants knew or had reason to know of the specific use for which the Affected Products were purchased.

222. Defendants provided Plaintiff and the Subclass members with an implied warranty that the Affected Products were merchantable and fit for the ordinary and particular purposes for which they were sold.

223. Defendants breached the implied warranty of merchantability because the Affected Products, which were marketed as safe and suitable for children, to be merchantable, must provide a suitable and safe sitting area for children in a car, and, for the reasons stated above, the Affected

Products are not safe and, in fact, are dangerous. These Affected Products, when sold and at all times thereafter, were not fit for the particular purpose for which consumers purchased them.

224. The Affected Products are unsafe and dangerous because they are of such a character that when used in their expected manner they are a source of potential death and injury to children.

225. Plaintiff and members of the Subclass are among those intended to be ultimate consumers of the Affected Products.

226. At all times that Defendants warranted and sold the Affected Products, they knew, or had reason to know, that Plaintiff and class members were purchasing the Affected Products for the particular purpose of using the Affected Products for use as a safe car seat.

227. Defendants also knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Affected Products, and instead continued to issue false warranties, and continued to insist the product is safe.

228. These Affected Products, when sold and at all times thereafter, were not fit for the particular purpose for which consumers purchased them.

229. On November 21, 2025, Plaintiff sent Defendants a letter informing them of her statutory consumer protection and warranty claims under California law.

230. It is not required, and would be futile, for Plaintiff to provide Defendants further opportunity to cure their breach. Defendants have also been provided notice of their breaches of warranty through numerous consumer complaints.

231. The Affected Products were defective when Defendants delivered them to their resellers, dealers, and distributors which sold the Affected Products, and the Affected Products were therefore still defective when they reached Plaintiff and the Class. The defect is inherent and

was present in each Affected Products at the time of sale, and the Affected Products remain defective after the Recall.

232. Defendants' resellers, dealers, and distributors are intermediaries between Defendants and consumers. These intermediaries sell the Affected Products to consumers and are not, themselves, consumers of the Affected Products, and therefore have no rights against Defendants.

233. Defendants' warranties were designed to influence consumers who purchased and/or owned the Affected Products.

234. Plaintiff and each Subclass member's acquisition of the Affected Products suffices to create privity of contract between Plaintiff and all other members of the Subclass, on the one hand, and Defendants, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Subclass members are intended third-party beneficiaries of contracts between Defendants and their resellers, authorized dealers, and, specifically, of Defendants' implied warranties.

235. As a result of Defendants' breach of the applicable implied warranties, purchasers of the Affected Products suffered an ascertainable loss of money, property, and/or value of their Affected Products.

236. As a direct and proximate result of Defendants' breach of implied warranty of merchantability, Plaintiff and the Subclass are entitled to damages in an amount to be determined at trial.

237. Plaintiff also seeks injunctive relief, including a state-of-the-art notice program for the wide dissemination of a factually accurate recall notice for the Affected Products and the implementation of a corrective advertising campaign by Defendants.

238. Additionally, Plaintiff and the Subclass seek attorneys' fees and costs pursuant to Cal. Civ. Code § 1794.

**COUNT VII**
**NEGLIGENCE**
**(*On Behalf of Plaintiff and the Nationwide Class*)**

239. Plaintiff incorporates the allegations set forth in the previous Paragraphs as though set forth fully herein.

240. Plaintiff brings this claim on behalf of themselves and the Nationwide Class against Defendants.

241. Defendants had a duty to exercise reasonable care in the design of the Affected Products to avoid unreasonable, foreseeable risks of harm where safer, feasible alternatives existed.

242. The Revolve360 Slim car seats' headrest is designed in a way that allows children to easily reach and remove the foam during normal use. This creates a foreseeable risk, as children can place the foam in their mouths or noses, posing a choking hazard. Even under ordinary use, the design exposes children to a danger that could have been reasonably prevented.

243. Feasible, safer alternative designs were available at reasonable cost, at all relevant times, including, but not limited to: (a) properly securing the headrest foam with adequate adhesive or mechanical fasteners to prevent child access; (b) fully enclosing the foam within non-removable protective materials; (c) using alternative headrest materials that do not present a choking hazard; (d) designing the headrest so that foam components are completely inaccessible to children; and (e) including clear warning labels on the Affected Products regarding the choking hazard.

244. Other car seat manufacturers produce safe car seats with properly secured headrest components, demonstrating that the risk inherent in Defendants' Affected Products is demonstrably avoidable through proper design.

245. Defendants breached their duty by adopting and selling the above design without proper safeguards.

246. This defective design was a substantial factor in causing foam dislodging as alleged by Plaintiff and the putative Class Members.

247. Defendants had actual and constructive knowledge of the defect well before the Recall announcement, including consumer complaints, internal testing, and incident data accumulated over years. Defendants continued marketing and selling the Affected Products without adequate warning or redesign.

248. Plaintiff and the Class suffered damages and related losses, proximately caused by Defendants' negligent design.

**COUNT VIII**
**FRAUDULENT CONCEALMENT**
**(*On Behalf of Plaintiff and the Nationwide Class*)**

249. Plaintiff incorporates the allegations set forth in the previous Paragraphs as though set forth fully herein.

250. Plaintiff brings this claim on behalf of themselves and the Nationwide Class against Defendants.

251. Defendants had a duty to disclose material facts to Plaintiff and Class Members, given their relationship as contracting parties and intended users of the Affected Products.

252. Defendants had superior knowledge about the defective nature of the Affected Products at issue, particularly the risk of the headrest foam becoming dislodged and creating a choking hazard to children, which made them unfit for ordinary use.

253. During the time Plaintiff and Class Members purchased and used the Affected Products, they used the products without being aware of the Choking Hazard Defect, reasonably believing that the Affected Products were safe for use.

254. Defendants knew or should have known about the Choking Hazard Defect but failed to warn consumers, retailers, or regulators. Specifically, Defendants received notice of the defect on October 2, 2023, and received multiple additional reports through the second quarter of 2025, yet continued to sell the Affected Products despite this knowledge.

255. Defendants either knew or should have known about the risk, particularly after receiving consumer reports, including eight reports of foam access and ingestion and twelve additional reports of children accessing the foam.

256. Defendants failed to disclose these material facts with the intent to induce consumers into purchasing the Affected Products, despite the latent defect. This failure constitutes fraudulent concealment as Defendants intentionally withheld critical safety information that, if disclosed, would have affected consumers' purchasing decisions.

257. Plaintiff and Class Members reasonably relied on Defendants' failure to disclose, believing that the Affected Products were safe when, in fact, they were not.

258. Had Plaintiff and Class Members known the true risks, they would not have purchased the Affected Products or would have paid significantly less.

259. As a direct and proximate result of Defendants' fraudulent concealment, Plaintiff and Class Members suffered financial losses, including the cost of purchasing defective Affected Products, the risk of harm, and the devaluation of their purchases.

260. Because Defendants acted with willful and malicious intent, punitive damages are warranted to deter future misconduct and punish Defendants for knowingly concealing critical safety information from consumers.

**COUNT IX**
**UNJUST ENRICHMENT**
**(*On Behalf of Plaintiff and the Nationwide Class*)**

261. Plaintiff incorporates the allegations set forth in the previous Paragraphs as though set forth fully herein.

262. Plaintiff brings this claim on behalf of themselves and the Nationwide Class against Defendants.

263. Defendants' conduct violated, *inter alia*, state and federal law by manufacturing, advertising, labeling, marketing, distributing, and selling the Affected Products while misrepresenting and omitting material facts.

264. Defendants' unlawful conduct allowed Defendants to knowingly realize substantial revenues from selling the Affected Products at the expense of, and to the detriment or impoverishment of, Plaintiff and Class Members and to Defendants' benefit and enrichment. Defendants have violated fundamental principles of justice, equity, and good conscience.

265. Plaintiff and Class Members conferred significant financial benefits and paid substantial compensation to Defendants for the Affected Products, which were not as Defendants represented them to be.

266. Defendants knowingly received and enjoyed the benefits conferred by Plaintiff and Class Members.

267. It is inequitable for Defendants to retain the benefits conferred by Plaintiff and Class Members' overpayments.

268. Plaintiff and Class Members seek to establish a constructive trust from which Plaintiff and Class Members may seek restitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, respectfully request that this Court:

A. Certify this case as a class action on behalf of the Nationwide Class and Subclasses defined herein, appoint Plaintiff as Class Representative, and appoint Plaintiff's counsel as Class Counsel;

B. Enter judgment in favor of Plaintiff and the Classes and against Defendants on all claims asserted herein;

C. Award Plaintiff and the Classes all applicable damages, including actual, compensatory, statutory, and punitive damages, in amounts to be determined at trial;

D. Award Plaintiff and the Classes restitution, rescission, and disgorgement of all unjust profits and ill-gotten gains obtained by Defendants from the sale of the Affected Products;

E. Enjoin Defendants from continuing to manufacture, market, distribute, and sell the Affected Products with the Choking Hazard Defect;

F. Order Defendants to implement an adequate recall program, including offering full refunds or replacement products to all consumers who purchased the Affected Products;

G. Order Defendants to implement a court-supervised corrective advertising campaign to alert consumers to the safety concerns and dangers of the Affected Products;

H. Award Plaintiff and the Classes pre-judgment and post-judgment interest on all monetary awards;

I. Award Plaintiff and the Classes reasonable attorneys' fees, costs, and litigation expenses as permitted by law;

J. Grant such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff, on behalf of herself and all others similarly situated, hereby demand a trial by jury on all issues so triable.

Dated: November 24, 2025

Respectfully submitted,

*/s/ Nicole Maruzzi*
Zachary Arbitman*
Nicole Maruzzi
George Donnelly*
**FELDMAN SHEPHERD WOHLGELERNTER TANNER WEINSTOCK & DODIG, LLP**
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
T: (215) 567-8300
F: (215) 567-8333
zarbitman@feldmanshepherd.com
gdonnelly@feldmanshepherd.com
nmaruzzi@feldmanshepherd.com

*Attorneys for Plaintiff and the Class*

*Pro Hac Vice Application Forthcoming